# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| JONATHAN FERRIE, individually and on behalf of all others similarly situated | : : : | CIVIL ACTION NO. 3:15-cv-00409 (JCH) |
| Plaintiff, | : : | |
| v. | : : | |
| DIRECTV, LLC | : : | |
| Defendant. | : : | JUNE 10, 2015 |

## MEMORANDUM OF LAW IN OPPOSITION TO DIRECTV'S MOTION TO DISMISS AND/OR STAY PROCEEDINGS PENDING ARBITRATION AND TO COMPEL ARBITRATION

John R. Horvack, Jr.
John L. Cordani, Jr.
Carmody Torrance Sandak & Hennessey, LLP
195 Church Street
P.O. Box 1950
New Haven, CT  06509-1950
Tel:  203-777-5501
Fax:  203-784-3199

*Attorneys for JONATHAN FERRIE, individually and on behalf of all others similarly situated*

{N5092130;2}

# TABLE OF CONTENTS

Page

I.  INTRODUCTION................................................................. .   1

II.  FACTS................................................................................   2

III.  LEGAL STANDARD..........................................................   5

IV.  ARGUMENT.......................................................................   5

    A.   Ferrie Did Not Agree to the Customer Agreement or the Arbitration Clause..................................................................   5

        1.   Even if received, the emails and letter allegedly sent to Ferrie were not sufficient for Ferrie's silence to be a manifestation of assent............................................................   6

        2.   Even if received and actually reviewed, the emails and letter allegedly sent to Ferrie were not sufficient for Ferrie's silence to be a manifestation of assent....................................   9

        3.   A reasonable fact-finder could conclude that the relevant emails and letter were not even actually sent or received........   11

    B.   DirecTV's Customer Agreement and Arbitration Clause Are Substantively and Procedurally Unconscionable..................................   15

V.  CONCLUSION....................................................................   19

# TABLE OF AUTHORITIES

Page(s)

<u>**Cases**</u>

*55 Trumbull Street Assoc, LLC v. Otis Elevator Co.*,
2015 WL 2035413 (Conn. Super. 2015)...................................................................... 16

*AT&T Mobility LLC v. Concepcion*,
131 S. Ct. 1740 (2011)...................................................................................................... 15

*Auto Glass Express, Inc. v. Hanover Ins. Co.*,
293 Conn. 218 (2009)........................................................................................................ 5

*Bender v. Bender*,
292 Conn. 696 (2009)...................................................................................................... 15

*Berkson v. Gogo LLC*,
--F.Supp.3d --, 2015 WL 1600755 (E.D.N.Y. Apr. 9, 2015).................................. 13

*Cheshire Mortg. Service, Inc. v. Montes*,
223 Conn. 80 (1992)........................................................................................................ 15

*D'Antuono v. Service Road Corp.*,
789 F.Supp.2d 308 (D. Conn. 2011)..................................................................5, 9, 15, 18

*Diskin v. JP Stevens & Co., Inc.*,
836 F.2d 47 (1st Cir. 1987)............................................................................................ 10

*Grosvenor v. Quest Comm'n Int'l, Inc.*,
2010 WL 3906253 (D. Colo. 2010)............................................................................... 14

*LaVelle v. Ecoair Corp.*,
74 Conn.App. 710 (2003)................................................................................................ 10

*Matter of Marlene Indus. Corp.*,
45 N.Y.2d 327 (1978)....................................................................................................... 10

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014)........................................................................................ 12

*Schnabel v. Trilegiant Corp.*,
697 F.3d 110 (2d Cir. 2012)........................................................................................ 6, 9

*Schnabel v. Trilegiant Corp.*,
2011 WL 797505 (D. Conn. 2011)..............................................................................  8, 9, 11

*Schubtex, Inc. v. Allen Synder, Inc.*,
49 N.Y.2d 1 (1979)............................................................................................  10

*Specht v. Netscape Comm'n Corp.*,
306 F.3d 17 (2d Cir. 2002)..................................................................................  12

## **Statutes**

9 U.S.C § 2............................................................................................................  15

## I.    INTRODUCTION

Like the many hardworking citizens of this State, DirecTV must pay taxes on income derived from its Connecticut services in return for the privilege of doing business in this State and the protection of its laws.  Nothing prevents DirecTV from passing this cost of doing business along to its Connecticut customers.  However, DirecTV is not entitled to pass this cost along to Connecticut customers in an unfair and deceptive manner.  DirecTV unfairly and deceptively hides this hidden cost from its Connecticut customers until they are locked into long term contracts with onerous cancellation fees and automatic bill payments.  Even then, DirecTV only "discloses" the charge by listing it under the heading "taxes" in its bills next to the sales tax suggesting that it is a tax on customers that DirecTV is obligated to collect, just like the sales tax. Nothing in the Connecticut Department of Revenue Services guidance, relied on by DirecTV, allows DirecTV to do this.  In this putative class action lawsuit, Plaintiff Jonathan Ferrie seeks redress under the Connecticut Unfair Trade Practices Act ("CUTPA") for this unfair and deceptive scheme.

DirecTV now claims that Jonathan Ferrie agreed to arbitrate this dispute with DirecTV and to waive class-actions.  Regardless of the fact that such a result would effectively destroy a remedy for DirecTV's unfair and deceptive trade practices, Ferrie never actually agreed to the Customer Agreement containing the arbitration clause that DirecTV relies upon.  In fact, a review of the factual background shows that DirecTV's practices relating to the arbitration clause were similar in their unfairness and deception to DirecTV's handling of its gross revenue taxes.  Additionally, DirecTV's Customer Agreement is unconscionable.  The Court should deny DirecTV's motion and allow this case to proceed forward.

## II.    FACTS

The parties agree that Ferrie ordered his DirecTV service on June 25, 2013 by calling 1-800-DIRECTV and placing his order over the phone.  However, as discussed below, Ferrie concluded that the parameters of their contractual relationship were established on this telephone call, while DirecTV claims that the parties' contract was modified by later events.  The following facts are established by the accompanying declarations of Jonathan Ferrie and Sarah Ferrie.  (Ex. A, Declaration of Jonathan Ferrie; Ex. B, Declaration of Sarah Ferrie).

In 2013, Jonathan and Sarah Ferrie were newly-weds and first-time homebuyers.  They closed on 24 Arbor Meadow Drive in Prospect Connecticut on June 28, 2013 and moved in a day or two afterwards.  Ahead of the move, Jonathan Ferrie desired to set up television service at the new home and shopped around online.  After viewing DirecTV's advertisements, including especially their prices, Ferrie decided to set up an account with DirecTV. He called DirecTV on June 25, 2013.

During the telephone call, DirecTV quoted Ferrie a price for his service that did not include the tax reimbursement charges and was told that he would have to agree to two years of service through DirecTV.  Ferrie agreed to the terms, gave DirecTV his credit card information, and authorized DirecTV to automatically charge his card on a month-to-month basis for the DirecTV services.  Ferrie also scheduled an installation appointment for the DirecTV equipment for July 1, 2013.  Given the clear and simple offers and acceptances exchanged during the call, Ferrie concluded that the parties' contractual relationship was established and governed by the terms and parameters discussed during the call.

Ferrie was not told during the call that further contractual activities had to be conducted. He was never told that his agreement with DirecTV was to be reduced to writing.  He was never

told that he would be receiving emails containing a Customer Agreement or any important contractual email for that matter. He was never told that he would be receiving a letter containing a Customer Agreement. He was never told that he or his agent had to sign a contract with DirecTV during the installation appointment or that anything of contractual importance would take place at the installation appointment. Indeed, he was never even told that he or his agent needed to be present for the installation appointment. Despite this, DirecTV claims that its contractual relationship with Ferrie was materially altered by three events: (1) the sending of multiple emails, (2) the sending of a letter, and (3) events that took place during DirecTV's installation visit.

First, DirecTV claims that after Ferrie's telephone call they sent him emails at jonathan.ferrie@gmail.com containing information about the Customer Agreement. However, Ferrie does not check his email account for jonathan.ferrie@gmail.com often. If he was made aware that important emails would be sent to him by DirecTV, he would have given DirecTV his primary business email address, which he checks often and whose emails he more closely reviews. In any event, Ferrie does not remember receiving the emails and certainly never read them. There are numerous explanations for this. First, the emails could have gone into Ferrie's spam folder. Second, they could have failed to download because Ferrie's inbox was full. Third, the emails also could have been deleted by Ferrie without opening or review because Ferrie believed them to be spam, advertisements, or unimportant. It is Ferrie's practice to delete emails from businesses such as DirecTV without review unless he had reason to think that something important would be arriving. Fourth and finally, as more fully explained below, inconsistencies in DirecTV's business records give rise to an inference that many of the emails DirecTV claims to have sent were not actually sent to Ferrie.

Second, DirecTV claims that they sent Ferrie a letter containing the Customer Agreement on June 25, 2013. However, Ferrie did not reside at 24 Arbor Meadow Drive in Prospect Connecticut until after June 28, 2013, probably either June 29 or 30, 2013. It also took several days after that for Ferrie to even start receiving mail at his new address from the post office. Since DirecTV never told Ferrie that they would be sending him an important letter, Ferrie was had no reason to advise DirecTV that a letter sent to the address would not be received by him. In any event, neither Ferrie nor Sarah Ferrie received the letter. The letter must have either been received by the previous homeowners and discarded or was never delivered by the post office because Ferrie was not registered as living there.

Third, DirecTV claims that Jonathan Ferrie agreed to the Customer Agreement by signature during the installation appointment on July 1, 2013. However, Jonathan Ferrie was not present for the installation appointment. Only Sarah Ferrie was present, who had neither actual nor apparent authority to sign a contract with DirecTV on Jonathan Ferrie's behalf. (The DirecTV account is in Jonathan Ferrie's name alone, and Sarah Ferrie had nothing to do with the ordering of DirecTV). Sarah Ferrie was never asked whether she had authority to sign on Jonathan's behalf and never told the installer that she could do so.

Additionally, Sarah Ferrie was not given any contractual documents during the installation appointment, including the Customer Agreement, and was told by the installer that she was signing only to acknowledge receipt of the DirecTV equipment, much like signing for a package. Furthermore, while Sarah Ferrie recognizes her signature for two of the boxes on Exhibit 1 to the Declaration of Elmo Ortiz, the third signature is not her signature. Notably, the third signature block is the only one that references an alleged "Customer Agreement."

Therefore, even Sarah Ferrie did not agree to the Customer Agreement, much less Jonathan Ferrie.

### III.   LEGAL STANDARD

DirecTV's memorandum fails to set forth the applicable legal standards by which a court must adjudicate a motion to compel arbitration at this early point in the litigation. "It is well settled that whether parties have agreed to submit a particular dispute to arbitration is typically an issue for judicial determination. To satisfy itself that an agreement to arbitrate exists, a court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." *D'Antuono v. Service Road Corp.*, 789 F.Supp.2d 308, 319 (D. Conn. 2011) (internal citation omitted). "The party seeking an order compelling arbitration must substantiate its entitlement to arbitration by a showing of evidentiary facts that support its claim that the other party agreed to arbitration." *Id.* "If the party seeking to compel arbitration makes such an evidentiary showing, the party opposing arbitration may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried as to the making of the arbitration agreement." *Id.* at 319-20. "Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement." *Id.* at 320. Thus, the motion to compel arbitration is viewed through the same lens as a "motion for summary judgment." *Id.*

### IV.   ARGUMENT

#### A.   Ferrie Did Not Agree to the Customer Agreement or the Arbitration Clause

Under Connecticut law, "the essential elements of contract formation are offer and acceptance." *D'Antuono*, 789 F.Supp.2d at 322 (citing *Auto Glass Express, Inc. v. Hanover Ins.*

*Co.*, 293 Conn. 218, 227 (2009)). "The touchstone of the inquiry [as to acceptance under California and Connecticut law] is the parties' outward manifestations of assent." *Schnabel v. Triegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012). "The conduct manifesting such assent may be words or silence, action or inaction, but the conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Id.* at 120. "A person has reason to know a fact, present or future, if he has information from which a person of ordinary intelligence would infer that the fact in question does or will exist. …There is also reason to know if the inference would be that there is such a substantial chance of the existence of the fact that, if exercising reasonable care with reference to the matter in question, the person would predicate his action upon the assumption of its possible existence." *Id.* at 120 n. 8.

      1.    *Even if received, the emails and letter allegedly sent to Ferrie were not sufficient for Ferrie's silence to be a manifestation of assent.*

      DirecTV asserts that Ferrie assented to the Customer Agreement after Ferrie agreed to DirecTV's advertised terms when he ordered DirecTV service over the telephone. This situation is controlled by *Schnabel*. In *Schnabel*, the plaintiffs enrolled in Triegiant's "Great Fun" service online and only later received terms and conditions including an arbitration clause by email. *Schnabel*, 697 F.3d at 121. Triegiant, like DirecTV here, tried to analogize this situation to the "conventional shrinkwrap-license cases." *Id.* Alternatively, Triegiant argued that the emailed terms and conditions should be considered a proposed amendment to the contract formed when the plaintiffs ordered the service online, assented to by the plaintiffs' failure to cancel the service in a timely manner thereafter. *Id.* at 122. The Second Circuit determined that they did not need to adjudicate which of these alternatives better suited the facts of the case because the terms sent

by Trilegiant were never accepted by the plaintiffs at all. *Id.* at 122-23. The Second Circuit held, as a matter of law, that "[w]e do not think that an unsolicited email from an online consumer business puts recipients on inquiry notice of the terms enclosed in that email and those terms' relationship to a service in which the recipients had already enrolled, *and* that a failure to act affirmatively to cancel the membership will, alone, constitute assent." *Id.* at 123.

The Court reasoned that the only cases where a customer has been held to be on inquiry notice of terms delivered after the relationship was initiated "have in common the fact that in each such case, in light of the history of the parties' dealings with one another, reasonable people in the parties' positions would be on notice of the existence of the additional terms and the type of conduct that would constitute assent to them." *Id.* at 124. The court also noted that in the shrinkwrap cases, the terms were packaged *with the product* such that no one could possibly use the product without seeing the terms. *Id.* at 125. In other cases, "the language of the original agreement expresses the intent of making the separate, future terms and conditions a part of the contract." *Id.* Therefore, receipt of "an email does not without more establish that [the customer] should know that the terms disclosed in the email relate to a service in which he or she had previously enrolled and that a failure affirmatively to opt out of the service amounts to assent to those terms." *Id.* at 126. "The case law does not support such a 'terms later by email' conception of contract formation under these conditions." *Id.* "Unlike shrinkwrap agreements, moreover, the recipient of the terms in this case would not have been confronted with the existence of additional terms before being able to benefit from Great Fun." *Id.* at 126.

This case is analogous to *Schnabel*. Ferrie ordered DirecTV service by placing a telephone call to DirecTV. All of the essential terms of their contractual relationship were discussed over the telephone, including Ferrie's promise to maintain DirecTV service for at least

two years.  Ferrie scheduled an appointment and gave DirecTV his credit card information.  No additional terms, important emails and letters, or further written contracts were discussed.  *Schnabel v. Trilegiant Corp.*, 2011 WL 797505, at \*5 (D. Conn. 2011) ("Nowhere in Trilegiant's initial terms … did the company indicate that the Schnabels would be bound by a separate document. The simple reference to a 'welcome email' is a far cry from the language necessary to indicate manifest agreement to the later email's terms and conditions.").  Moreover, Ferrie did not actually review the emails or letters (and as discussed below some were not actually received).  Even if received, Ferrie was not put on inquiry notice to read the email or letter because he had already reasonably concluded that the terms of his arrangement with DirecTV were established.  Unlike a shrinkwrap agreement, Ferrie did not need to confront the terms in order to use the DirecTV service.

Furthermore, it would not be reasonable for DirecTV to infer his acceptance of the terms unless Ferrie immediately canceled his service.  To the contrary, the dealings between the parties indicated otherwise because Ferrie was informed on the telephone that he was committing (then and there) to at least two years of DirecTV service.  Therefore, the only true course of dealings between the parties indicated to Ferrie that he was not free to cancel his service at the time he may have received the emails or letter.

Finally, Sarah Ferrie's actions during the installation visit cannot be imputed to Jonathan Ferrie because she neither had actual nor apparent authority to bind Jonathan Ferrie to the contract.  Sarah Ferrie was never asked whether she could sign on Jonathan Ferrie's behalf and never held herself out as his agent.  Jonathan Ferrie was never told that he or his agent needed to be present for the installation.  Moreover, regardless of the agency issue, the relevant signature produced by DirecTV under the provision that references the Customer Agreement looks

patently different than Sarah Ferrie's other signatures and Sarah Ferrie does not recognize it as her signature.  While it is true that "the fact that a party signed a written agreement is usually conclusive evidence of contract formation," no one (not even including Sarah Ferrie) actually signed the Customer Agreement during the installation visit. *D'Antuouno*, 789 F.Supp.2d at 323-325 (denying motion to compel arbitration because employee never actually signed the agreement containing the arbitration clause).

Moreover, this all could have been avoided easily by DirecTV.  DirecTV could have programmed its emails to require the customer to click on a link to acknowledge receipt and acceptance of the terms and conditions. *Schnabel*, 2011 WL 797505, at *5 n.8 ("Trilegiant's approach in this case is all the more suspect in light of its decision to not use a clickwrap contract, requiring a consumer to affirmatively 'accept' or 'reject' terms and conditions.").  DirecTV could have ensured that Ferrie or his agent were present for the installation visit so that they could sign the agreement.  As in the shrink-wrap cases, DirecTV could have ensured that Ferrie *had* to be confronted with the terms in order to use DirecTV services.  Thus, "[t]his defect weighs all the more heavily because it could so easily have been remedied." *Schnabel*, 697 F.3d at 128.

For these reasons, even if DirecTV's emails and letter were delivered, Ferrie was not on inquiry notice of the terms of the Customer Agreement.  Therefore, his receipt and payment for DirecTV service for the contractual period of two years did not constitute acceptance of the Customer Agreement.

> 2.   *Even if received and actually reviewed, the emails and letter allegedly sent to Ferrie were not sufficient for Ferrie's silence to be a manifestation of assent.*

Even if DirecTV's emails and letters were actually received and reviewed (which they were not), Ferrie's silence thereafter does not constitute a manifestation of assent. This is because the parties had already arrived at the terms of the agreement during the telephone call and Ferrie was under no obligation to agree to amend their agreement. Ferrie's silence and subsequent payments to DirecTV was fully consistent with the *original* terms of the contract and therefore cannot be taken to be as assent to the modified terms proposed by DirecTV. While a written confirmation which is sent within a reasonable time after agreement can be accepted through silence and performance some times, such a confirmation is never effective without express assent where the confirmation "materially alter[s]" the original agreement. *Diskin v. JP Stevens & Co., Inc.*, 836 F.2d 47, 50 (1st Cir. 1987). "[I]t is clear that an arbitration clause is a material addition which can become part of a contract only if it is ***expressly*** assented to by both parties." *Id.* (emphasis added) (quoting *Matter of Marlene Indus. Corp.*, 45 N.Y.2d 327, 334 (1978)). The Court in *Diskin* also relied on *Schubtex, Inc. v. Allen Synder, Inc.*, 49 N.Y.2d 1 (1979). *Id.* at 51. "*Schubtex* involved an oral agreement which was 'confirmed' by the seller's form containing an arbitration provision. The buyer retained the seller's written confirmation form without acting on it. ...The retention of the form, without objection, was insufficient..." *Id.*; *see also LaVelle v. Ecoair Corp.*, 74 Conn.App. 710, 717-18 (2003) (refusing to find modification to employment agreement because the parties' performance was not inconsistent with the terms of the previous contract).

Ferrie had already ordered DirecTV service and set the terms for his arrangement with DirecTV over the telephone. Even if the emails and letter were received and reviewed, Ferrie was under no obligation to call DirecTV to tell them that he disagreed and none of Ferrie's actions were consistent with him agreeing to the proposed modification and inconsistent with

him simply abiding by the original terms negotiated on the telephone. *See Schnabel*, 2011 WL 797505, at *4 ("No reasonable jury would view the Schnabels' failure to cancel their subscription after having viewed this email (assuming they did) as a manifestation of assent to the email's terms. Trilegiant had never before communicated by email with [the plaintiffs] and nothing within its prior interaction with the two men would suggest that this was an acceptable means of communicating binding terms and conditions."). Especially in the instances where DirecTV's communications did not indicate that DirecTV would assume acceptance unless Ferrie called and canceled his service, Ferrie's silence is not acceptance. Moreover, Ferrie had already agreed to accept and pay for DirecTV service for at least two years (with onerous cancellation fees). Therefore, a reasonable customer could have reasonably believed that he had no choice but to continue paying for DirecTV's service.

Indeed, DirecTV's Customer Agreement indicates that "if you do not accept these terms, please notify us immediately and we will cancel your order or service *subject to applicable cancelation terms and/or fees*." (Dec. of Steve Lee, Exhibit 5, p.1) (emphasis added). Therefore, Ferrie was not free to accept or reject DirecTV's alleged offer. DirecTV cannot unfairly attempt to impose additional terms on a customer while at the same time insisting on penalty fees from their original agreement if the customer does not accept the additional terms.

For these reasons, even if DirecTV's emails and letter were received and read, Ferrie never accepted DirecTV's proposed modification to the terms of the agreement formed during the telephone conversation.

> 3.    *A reasonable fact-finder could conclude that the relevant emails and letter were not even actually sent or received.*

DirecTV relies on several emails and a letter as containing the Customer Agreement

including the arbitration clause.  However, only <u>two</u> of those emails and the letter actually contained the text of the Customer Agreement.  All of the other emails only contained hyperlinks to the Customer Agreement.  Thus, these emails and letter can be put into two groups: (1) the emails with only a hyperlink to the Customer Agreement and (2) the emails and letter that actually allegedly contained the text of the arbitration clause.  First, the emails with only hyperlinks are a form of impermissible "browsewrap" and do not put individual consumers on reasonable inquiry notice of the terms of the agreement.  Thus, DirecTV cannot rely on these emails alone.  Second, a reasonable fact-finder can conclude that the emails and letter that DirecTV contends contained the actual text of the Customer Agreement were never actually sent and/or never received.

First, with respect to the group of emails containing hyperlinks, the "common law is clear that an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious." *Specht v. Netscape Comm'n Corp.*, 306 F.3d 17, 30 (2d Cir. 2002) (Sotomayor, J.).  Hyperlinks are routinely recognized as a form of "browse-wrap" and are not conspicuous enough to create a contract.  "The defining feature of browse-wrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014).  "[W]here, as here, there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Id.* at 1177.  "[P]roximity or conspicuousness of [a] hyperlink alone is not enough to give rise to constructive notice …[especially in view of] courts' traditional reluctance to enforce

browsewrap agreements against individual consumers." *Id.* at 1178. "[C]onsumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." *Id.* at 1179. "Following the ruling in *Specht,* courts generally have enforced browsewrap terms only against knowledgeable accessors, such as corporations, not against individuals." *Berkson v. Gogo LLC*, --F.Supp.3d --, 2015 WL 1600755, at *27 (E.D.N.Y. Apr. 9, 2015) (Weinstein, J.). "Unlike the basic internet contract for a sale and payment, arbitration and forum selection clauses materially alter the substantive default rights of a consumer. They are not enforceable against ordinary consumers who are unlikely to be aware of them." *Id.* at 35.

Thus, the emails containing hyperlinks alone were insufficient to form an agreement to arbitrate, especially where Ferrie did not know important emails would be received and DirecTV's system did not force Ferrie to click the hyperlinks in order to receive DirecTV service. This leaves only the two emails containing the text of the Customer Agreement and the letter that DirecTV alleges contained the Customer Agreement. Together these three items (the two emails and the letter) comprise the only times when DirecTV claims to have sent the full text of the Customer Agreement to Ferrie. However, for the reasons discussed below, a reasonable fact-finder could conclude that those two emails and letter were never sent and/or never delivered.

Relevant emails are contained within the Exhibits to Steve Lee's Declaration. Importantly, the last page of Exhibit 1 (one of the emails with an ineffective hyperlink) indicates that "This email was sent to Jonathan.Ferrie@gmail.com." However, the alleged email shown in Exhibit 3 (the first email with the text of the Customer Agreement) contains no such indication. The last page of Exhibit 3 states "This email was sent to *emailaddress*." The same applies to

Exhibit 7 of Steve Lee's Declaration, the second email allegedly sent to Ferrie containing the full

text of the Customer Agreement. It also states: "This email was sent to *emailaddress*." Thus,

a reasonable fact-finder can infer that these emails with the actual text of the Customer

Agreement were actually never sent or never actually received. None of DirecTV's declarants

have personal knowledge of the sending or receipt of the DirecTV emails, and DirecTV's

business records appear to be inconsistent. Thus, a reasonable fact-finder could conclude that the

only two emails allegedly sent by DirecTV containing the full text of the Customer Agreement

were never actually sent or never actually received by Ferrie. Ferrie cannot be on inquiry notice

of what was never sent or received.

Additionally, as discussed above, a reasonable fact-finder could conclude that DirecTV's

letter to Ferrie was never actually delivered or received to even potentially put Ferrie on inquiry

notice. As noted, the letter was addressed to Ferrie's new home address and mailed several days

before he actually moved into the home. DirecTV did not tell Ferrie that they would be mailing

him anything in the near future, and therefore, Ferrie is not to blame for not giving DirecTV his

then-current address. A reasonable factfinder could conclude that either the post office did not

deliver the letter or that the former homeowners of Ferrie's new address discarded the letter

when delivered before Ferrie's move-in date. In either event, Ferrie cannot be charged with

knowledge of such a letter. *See Grosvenor v. Quest Comm'n Int'l, Inc.*, 2010 WL 3906253, at *9

(D. Colo. 2010) (denying motion to compel arbitration because "Grosvenor has raised material

questions of fact as to contract formation, including: whether he ever received the Subscriber

Agreement, and whether he received the Welcome Letters.").

Therefore, there is a genuine dispute of fact as to whether the only communications to

Ferrie containing the actual Customer Agreement (and not an ineffective "browsewrap"

hyperlink) were actually delivered or sent to him.  Moreover, as discussed above, none of the

events that took place during the installation of the DirecTV equipment can be imputed to Ferrie

because neither him nor an authorized agent were present. For these reasons, there is at least a

genuine dispute of material fact as to whether Ferrie agreed to terms and conditions sent to him

only in an impermissible browsewrap format.

**B.     DirecTV's Customer Agreement and Arbitration Clause Are Substantively and Procedurally Unconscionable**

"The final phrase of [9 U.S.C] § 2 ... permits arbitration agreements to be declared

unenforceable upon such grounds as exist at law or in equity for the revocation of any contract.

This saving clause permits agreements to arbitrate to be invalidated by generally applicable

contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only

to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue."

*AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1746 (2011).

"The doctrine of unconscionability, as a defense to contract enforcement, generally

requires a showing that the contract was both procedurally and substantively unconscionable

when made – i.e, some showing of an absence of meaningful choice on the part of one of the

parties together with contract terms which are unreasonably favorable to the other party."

*Bender v. Bender*, 292 Conn. 696, 732 (2009).  The issue of unconscionability is a question of

law based on underlying factual findings reviewed for clear error.  *Cheshire Mortg. Service, Inc.*

*v. Montes*, 223 Conn. 80, 88 (1992).  "Regardless of one's views about the wisdom of [the

*Concepcion*] decision," *Concepcion* prevents a court from holding that contracts are

substantively unconscionable based on a conclusion that arbitration itself is unfair under the

circumstances.  *D'Antuono*, 789 F. Supp.2d at 322.  Thus, *Concepcion* precludes the argument

that the Customer Agreement is substantively unconscionable because the class-action arbitration waiver would effectively destroy the remedies of the citizens of this State since individual damages would be so limited.  However, "[t]he purpose of the doctrine of unconscionability is to prevent oppression and unfair surprise."  *Id.* at 327.  In this case, regardless of the unfairness of class-action arbitration waivers, the Customer Agreement was procedurally and substantively unconscionable for other reasons.

First, the Customer Agreement is procedurally unconscionable for the following reasons.

1.     DirecTV and Ferrie have unequal bargaining power since Ferrie is an individual consumer and DirecTV is a large corporation.

2.     DirecTV's Customer Agreement is a contract of adhesion offered on a take-it-or-leave-it basis.  *See 55 Trumbull Street Assoc, LLC v. Otis Elevator Co.*, 2015 WL 2035413 at *3 (Conn. Super. 2015) ("The procedural element of an unconscionable contract generally takes the form of a contract of adhesion, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.").

3.     It is procedurally unconscionable for DirecTV to lure customers in with telephone (or other) orders where the terms of the arrangement with DirecTV are made to seem simple and complete.  Consumers, like Ferrie, come to reasonably believe that the terms of the contractual arrangement with DirecTV are established on the call.  The consumers give DirecTV their credit card information and schedule installation appointments that would need to be cancelled after receipt of the Customer Agreement.

4.     It is procedurally unconscionable that DirecTV did not tell Ferrie that what was discussed on the telephone is not actually the full terms of the deal and that the full terms would be received by email or mail later on.

5.     It is procedurally unconscionable that DirecTV's emails do not require Ferrie to expressly register his agreement with the terms of the Customer Agreement by clicking a link or otherwise before DirecTV proceeds further with the service.

6.     It is procedurally unconscionable that DirecTV only allegedly has a customer sign the Customer Agreement *after* the installer already installed a DirecTV satellite dish on their home and ran cable throughout their rooms.

7.     It is procedurally unconscionable that DirecTV only told Sarah Ferrie that she was signing to acknowledge receipt of DirecTV's equipment and not that DirecTV was asking her to sign a contract.

8.     It is procedurally unconscionable that DirecTV failed to tell Ferrie that either he or his agent for contracts needed to be home for the installation visit.

9.     It is procedurally unconscionable that DirecTV failed to ask Sarah Ferrie whether Jonathan Ferrie gave her authority to sign contracts on his behalf.

All of the foregoing facts give rise to a reasonable inference of oppression and unfair surprise, satisfying the procedural unconscionability element of the defense.

Second, DirecTV's Customer Agreement is also *substantively* unconscionable because of its unfair early termination requirements as applied to this case.  DirecTV's Customer Agreement indicated that "if you do not accept these terms, please notify us immediately and we will cancel your order or service *subject to applicable cancelation terms and/or fees*." (Dec. of Steve Lee, Exhibit 5, p.1) (emphasis added).  During the telephone call when he ordered DirecTV services,

Ferrie agreed to maintain DirecTV service for two years (24 months).[1]  DirecTV's early

cancellation fee appears to be $20 per month.[2]  Therefore, if upon receipt of DirecTV's

Customer Agreement Ferrie desired to disagree with the terms and cancel his service, he would

have been subject to an early cancellation fee of $480, a very large sum for an individual

consumer especially one who received no services in return. This substantive portion of

DirecTV's Customer Agreement (having nothing to do with the unfairness of arbitration or class

action waivers under *Concepcion*) is outrageous.

 Additionally, Ferrie had already given DirecTV his credit card number, and there would

be no way to stop DirecTV from charging the "early cancellation fee."  In fact, DirecTV's

Customer Agreement makes this threat explicit by providing "[y]ou acknowledge that you have

provided your credit or debit card account information to us....you authorize us to apply this

method of payment ...to satisfy any and all amounts due upon cancellation."

 These terms are ones which "no man in his senses, not under delusion would make, on

the one hand, and which no fair and honest man would accept, on the other."  *D'Antuono*, 789

F.Supp.2d at 327.  DirecTV had the audacity to (i) accept Ferrie's order, (ii) fail to inform him

that other important terms would be arriving by mail or email, (iii) have Ferrie agree to a 24

month commitment, (iv) take Ferrie's credit card information, and (v) schedule an installation

appointment, all before allegedly attempting to inform Ferrie of material terms such as his

waiver of his constitutional rights to come to court and have a jury trial.  It is then

unconscionable for DirecTV's Customer Agreement to entitle DirecTV to automatically charge

Ferrie's credit card $480 in "early termination fees" in return for *no television services provided*

if Ferrie wishes to disagree with these hidden terms sprung upon him *after* he agreed to 24

---

[1] Ferrie intends to cancel his DirecTV service as soon as the 24 month term expires in July.
[2] https://support.directv.com/app/answers/detail/a_id/940/~/directv-cancellation-fee

months of service.  Indeed, the fact that DirecTV intended to insist upon Ferrie's 24 month commitment made during his telephone order is contained within the Customer Agreement itself. *See* Customer Agreement 5(b) ("you may be subject to an early cancellation fee if you agreed to a programming agreement with DIRECTV and have failed to maintain the required programming package for the required period of time").  No fair and honest man or woman would insist on $480 under such circumstances and no reasonable man or woman would agree to pay $480 under such circumstances.  Thus, DirecTV's Customer Agreement, including its arbitration clause, is also substantively unconscionable and deprived Ferrie of any meaningful choice.   The doctrine of unconscionability is clearly needed under these circumstances to prevent oppression and unfair surprise, and DirecTV's motion to compel arbitration should be denied on this basis.

## V.   CONCLUSION

For the foregoing reasons, DirecTV's motion to dismiss and/or stay and compel arbitration should be denied.

THE PLAINTIFF,

JONATHAN FERRIE, individually and
on behalf of all others similarly situated

Respectfully submitted,

John R. Horvack, Jr.
Federal Bar ct12926
John L. Cordani, Jr.
Federal Bar ct28833
Carmody Torrance Sandak & Hennessey, LLP
195 Church Street
P.O. Box 1950
New Haven, CT  06509-1950
Tel:  203-777-5501
Fax:  203-784-3199
jhorvack@carmodylaw.com
jlcordani@carmodylaw.com

**CERTIFICATION OF SERVICE**

I hereby certify that on June 10, 2015 a copy of foregoing Memorandum Of Law In

Opposition To DirecTV's Motion To Dismiss And/Or Stay Proceedings Pending Arbitration

And To Compel Arbitration was filed electronically and served by mail on anyone unable to

accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of

the Court's electronic filing system or by mail to anyone unable to accept electronic filing as

indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's

CM/ECF System.

_____

John R. Horvack, Jr.