**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JONATHAN FERRIE,<br>      Plaintiff, | CIVIL ACTION NO.<br>3:15-CV-409 (JCH) |
| v. | |
| DIRECTV, LLC,<br>      Defendant. | JANUARY 12, 2016 |

**RULING RE: DEFENDANT'S MOTION TO DISMISS / COMPEL ARBITRATION (DOC. NO. 17) & MOTION TO STAY (DOC. NO. 18), AND PLAINTIFF'S MOTION FOR LEAVE TO FILE SUR-REPLY (DOC. NO. 24) & MOTION TO AMEND (DOC. NO. 31)**

## I.    INTRODUCTION

Plaintiff Jonathan Ferrie ("Ferrie") brings this putative class action against defendant DirecTV, LLC ("DIRECTV"), alleging that DIRECTV violated the Connecticut Unfair Trade Practices Act ("CUTPA"), C.G.S.A. § 42-110a, et seq., by deceiving customers about the price of its service.  See Complaint (Doc. No. 1) ("Compl.").  Ferrie has also filed a Motion to Amend the Complaint (Doc. No. 31) ("Mot. to Amend"), in which he seeks to allege that DIRECTV violated section 52-570d of the Connecticut General Statutes by illegally recording a phone call between Ferrie and DIRECTV.  See Proposed Amended Complaint (Doc. No. 31-1) ("Prop. Am. Compl.").

In response to the Complaint, DIRECTV filed a Motion to Dismiss / Motion to Compel Arbitration (Doc. No. 17) ("Mot. to Compel Arb."), arguing that Ferrie's claim is subject to mandatory arbitration.  DIRECTV also opposed the Motion to Amend on the ground that the new claim is also subject to mandatory arbitration, thereby rendering amendment futile.  Additionally, DIRECTV has filed for a Motion to Stay Discovery Pending Resolution of DirecTV's Motion to Compel Arbitration (Doc. No. 18) ("Mot. to

1

Stay").  Lastly, Ferrie has filed a Motion for Leave to File a Sur-Reply (Doc. No. 24)

("Mot. to File Sur-Reply"), in which he seeks to reply to DIRECTV's reply to Ferrie's

opposition to the Motion to Compel Arbitration.[1]

## II.    FACTS[2]

On Tuesday, June 25, 2013, Ferrie initiated a telephone call with DIRECTV, in

which he inquired about, and ultimately ordered over the telephone, DIRECTV service.

See Memorandum of Law in Opposition to DIRECTV's Motion to Dismiss and/or Stay

Proceedings Pending Arbitration and to Compel Arbitration at 2 (Doc. No. 19) ("Pl.'s

Mot. to Compel Opp'n").  Prior to calling DIRECTV, Ferrie had looked at internet

advertisements for DIRECTV's products.  Pl.'s Mot. to Compel Opp'n Ex. A at ¶¶ 2, 3

(Doc. No. 19-1) ("Jonathan Ferrie Decl.").  During the telephone call, Ferrie informed the

DIRECTV representative that he was "moving into a new house this weekend."  See

Declaration of Shaun Paisley Ex. A at 2:12-13 (Doc. No. 21-1) ("Tr. of DIRECTV Call").

Ferrie provided DIRECTV with the address for his new home, which was in Prospect,

---

[1] For logistical reasons, the court will address Ferrie's Motion for Leave to File a Sur-Reply now. "When new evidence appears in opposition papers, the non-moving party should seek leave, or may receive the Court's sua sponte permission, to file a sur-reply to address those new issues." Travelers Indem. Co. v. Excalibur Reinsurance Corp., No. 3:11-CV-1209 (CSH), 2013 WL 4012795, at *3 (D. Conn. Aug. 5, 2013) (citing Guadagni v. New York City Transit Auth., 387 Fed.Appx. 124, 126 (2d Cir. 2010). However, as the plaintiff conceded at oral argument, the court's consideration of the Sur-Reply should be limited to those portions that address the new evidence.  See Travelers, at *3 (noting that sur-reply should address the new issues raised by the new evidence).

In connection with its reply brief, DIRECTV submitted an audio recording of the telephone call between Ferrie and DIRECTV (Doc. No. 20), a transcript of that call (Doc. No. 21-1), and a declaration regarding DIRECTV's early cancellation fee (Doc. No. 21-2).  Accordingly, the court will consider the portions of Ferrie's Sur-Reply that are responsive to these new pieces of evidence, but will disregard any non-responsive portions.  In that regard, the court grants Ferrie's Motion for Leave to File a Sur-Reply in part.

[2] Because the same standards that apply when ruling on a motion for summary judgment apply when ruling on a motion to compel arbitration, see Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003), the court draws "all factual inferences in favor of, and take[s] all factual assertions in the light most favorable to" the non-movant, Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

Connecticut.  See id. at 3:24-4:13.  He also informed DIRECTV that he was not moving into his new home until Saturday, June 29, 2013.  See id. at 34:6-13.

After discussing various programming and pricing options with DIRECTV, Ferrie agreed, during the same phone call, to "purchase programming from [DIRECTV] for twenty-four consecutive months or to pay the early cancellation fee of twenty dollars for each month of your agreement not completed."  Id. at 31:8-15.  Ferrie agreed that his monthly bill would be comprised of a base rate "plus applicable state tax and local fees and local taxes."  Id. at 29:7-10.  Ferrie agreed to a base monthly rate of $59.99 for the first 12 months, approximately $81.00 for months 13-16, and approximately $91.00 for months 17-24.  See id. at 29:7-16.  On the same call, Ferrie provided DIRECTV with a credit card number and enrolled in "Auto Bill Pay" and "paperless billing," thereby "authoriz[ing] DIRECTV to charge your card automatically to pay each of your monthly statements as well as final bill amounts and to receive your monthly billing statements at the e-mail address you provided."  Id. at 29:21-30:3.

Earlier in the phone call, Ferrie was asked to provide an e-mail address and was told that, "by providing an e-mail address, you'll receive communication on how to enjoy your DIRECTV to its fullest.  You'll also get an order confirmation e-mail, programming, and promotional information."  Id. at 15:17-22.  At that time, Ferrie provided DIRECTV with the e-mail address "jonathan.ferrie@gmail.com."  See id. at 15:23-17:5.  Later in the call, DIRECTV informed Ferrie that his monthly billing statements would be e-mailed to the address he had provided earlier in the call.  Id. at 29:21-30:3.

Towards the end of the call, Ferrie inquired whether DIRECTV partnered with any internet service providers.  See id. at 32:20-21.  At the end of the call, after Ferrie

had completed his order for television service, he was transferred to one of DIRECTV's telecommunications partners, who worked with Ferrie to bundle his DIRECTV television service with an internet service package.  See id. at 38:2-4.

DIRECTV claims that, upon completion of the phone call, it sent Ferrie multiple e-mails that contained either hyperlinks to DIRECTV's Customer Agreement or a full version of the Customer Agreement in the body of an e-mail.  See Memorandum in Support of DIRECTV's Motion to Dismiss and/or Stay Proceedings Pending Arbitration and to Compel Arbitration at 2-7 (Doc. No. 17-1) ("Def.'s Mot. to Compel Mem. in Supp.").  Ferrie has declared, under oath, that he "do[es] not recall receiving" these e-mails.  Jonathan Ferrie Decl. at ¶ 14.

DIRECTV also claims that it mailed Ferrie, in a single envelope, hard-copy versions of the Order Confirmation letter and the Customer Agreement.  Def.'s Mot. to Compel Mem. in Supp. at 4.  The mailing was sent from Utah to Ferrie's Prospect, Connecticut address on June 26, 2013, via United States Postal Service ("USPS") First Class Mail.  See Def.'s Mot. to Compel Mem. in Supp. Ex. C Ex. 3 (Doc. No. 17-4) ("Postage Statement") (date, place, and type of mailing); Def.'s Mot. to Compel Mem. in Supp. Ex. C Ex. 1 (Doc. No. 17-4) ("June 26 Order Confirmation Letter") (recipient address).  Ferrie, however, has submitted a sworn declaration in which he attests that he "never received this letter from DirecTV."  Jonathan Ferrie Decl. at ¶ 16.

The Customer Agreement contains language that states that, in the event that DIRECTV and a customer cannot resolve a dispute informally, "any legal or equitable claim relating to this Agreement, any addendum, or your Service . . . will be resolved only in binding arbitration."  See Def.'s Mot. to Compel Mem. in Supp. Ex. A Ex. 2 at ¶

9(b) (Doc. No. 17-2) ("June 25 Customer Agmt. E-mail").[3]  The Customer Agreement

also notifies customers, in the first paragraph of the Agreement, that:

> IF YOU DO NOT ACCEPT THESE TERMS, PLEASE NOTIFY US
> IMMEDIATELY AND WE WILL CANCEL YOUR ORDER OR
> SERVICE SUBJECT TO APPLICABLE CANCELLATION TERMS
> AND/OR FEES (SECTION 5).  IF YOU INSTEAD DECIDE TO
> RECEIVE OUR SERVICE, IT WILL MEAN THAT YOU ACCEPT
> THESE TERMS AND THEY WILL BE LEGALLY BINDING.

Id. at 1.  Ferrie did not call to cancel his order prior to installation.  Rather, the

installation of Ferrie's DIRECTV equipment and service occurred, as planned, on July 1,

2013.  See Tr. of DIRECTV Call at 34:14-19; Def.'s Mot. to Compel Mem. in Supp. Ex.

D Ex. 1 at 1 (Doc. No. 17-5) ("Work Order").

## III.    MOTION TO COMPEL ARBITRATION

### A.    Legal Standard

In determining whether to compel arbitration pursuant to the Federal Arbitration

Act ("FAA"), three issues may be relevant: (1) whether a valid agreement to arbitrate

disputes exists; (2) to the extent that a valid agreement exists, whether the asserted

claims are covered by the agreement and their coverage is not rendered void by law;

and, (3) if the court concludes that some, but not all, of the claims in the case are

arbitrable, whether staying the remaining claims pending arbitration is appropriate.  See

JLM Indus., Inc. v. Stolt–Nielsen SA, 387 F.3d 163, 169 (2d Cir. 2004).  On a motion to

compel arbitration, the court reviews the submissions before it using a standard

equivalent to the one applicable on a motion for summary judgment.  See Bensadoun,

316 F.3d at 175.  "If there is an issue of fact as to the making of the agreement for

---

[3] Paragraph 9(d) of the Customer Agreement contains certain exceptions to the mandatory
arbitration provision quoted above, which exceptions are not relevant here.  See id. at ¶ 9(d).

arbitration, then a trial is necessary." Id.

     B.    Discussion

         1.    Whether an agreement to arbitrate exists

     "The party seeking an order compelling arbitration must substantiate its

entitlement to arbitration by a showing of evidentiary facts that support its claim that the

other party agreed to arbitration." D'Antuono v. Serv. Road Corp., 789 F.Supp.2d 308,

319 (D. Conn. 2011) (internal quotation marks and alterations omitted).  "If the party

seeking arbitration has substantiated the entitlement by a showing of evidentiary facts,

the party opposing may not rest on a denial but must submit evidentiary facts showing

that there is a dispute of fact to be tried." Oppenheimer & Co. v. Neidhardt, 56 F.3d

352, 358 (2d Cir. 1995).  "[T]he ultimate question of whether the parties agreed to

arbitrate is determined by state [contract] law." Bell v. Cendant Corp., 293 F.3d 563,

566 (2d Cir. 2002).  While it is clear that the Customer Agreement contains a mandatory

arbitration provision, Ferrie argues that he never agreed to be bound by the Customer

Agreement, or by its arbitration provision.

         a.  The Customer Agreement

     DIRECTV argues that it sent Ferrie the Customer Agreement in various e-mails

and as a hard-copy through the regular mail, see Def.'s Mot. to Compel Mem. in Supp.

at 2-7, and that Ferrie "accepted the DIRECTV Customer Agreement, including its

arbitration provision, by choosing to receive DIRECTV service, instead of rejecting the

Customer Agreement by canceling his order," id. at 9.  Ferrie claims he "do[es] not

recall" receiving the Customer Agreement via e-mail, and claims he "never received" the

Customer Agreement via postal mail.  Jonathan Ferrie Decl. at ¶¶ 14, 16.  He also

argues that, even if he did receive the Customer Agreement, he did not assent to it by accepting, rather than cancelling, his DIRECTV service.  See Pl.'s Mot. to Compel Opp'n at 6-15.

> i.    June 25, 2013 "Order Confirmation E-mail"

DIRECTV asserts that, on June 25, 2013, the same day that Ferrie placed his order with DIRECTV over the phone, DIRECTV sent Ferrie an "order confirmation" e-mail.  See Def.'s Mot. to Compel Mem. in Supp. Ex. A at ¶ 15 (Doc. No. 17-2) ("Lee Decl.").  This e-mail instructed the recipient to review the Customer Agreement, which, the e-mail said, "[d]escribes general terms of service (packing and pricing subject to change)."  See id. Ex. 1 at 1 (Doc. No. 17-2) ("June 25 Order Confirmation E-mail"). The phrase "Customer Agreement" was written in blue and underlined, indicating that it was a hyperlink, which would have allowed the recipient to view the Customer Agreement by clicking on the phrase "Customer Agreement."  See Lee Decl. ¶ 15.  The Order Confirmation E-mail was personally addressed to "JONATHAN FERRIE," see June 25 Order Confirmation E-mail at 1, and it was sent to Jonathan.Ferrie@gmail.com, see id. at 4.

Both Steve Lee, a DIRECTV employee, and Dave Battaglini, the Chief Executive Officer of Xert Communications Corporation, which is the company that DIRECTV uses to handle bulk e-mailing, provided sworn declarations in which they stated that they accessed a web-based archive, searched for Ferrie's account, and located a copy of the June 25 Order Confirmation E-mail in the file for Ferrie's account.  See Lee Decl. ¶¶ 14-15; Def.'s Mot. to Compel Mem. in Supp. Ex. B at ¶¶ 8-9 (Doc. No. 17-2) ("Battaglini Decl.").  Further, both asserted that they could deduce, with certainty, that the June 25

Order Confirmation E-mail was successfully delivered to Ferrie's e-mail inbox.  They both declared, under oath, that "[a] document will only appear in this archive if it was successfully e-mailed or mailed to the customer."  Lee Decl. ¶ 13; <u>see also</u> Battaglini Decl. ¶ 7 ("If an e-mail is not successfully delivered (<u>e.g.</u>, if the e-mail is returned as undeliverable), then an electronic copy of the e-mail is not generated and nothing is archived").

    ii. June 25, 2013 "Customer Agreement E-mail"

  DIRECTV asserts that on June 25, 2013, it also sent Ferrie another e-mail, which contained the entire Customer Agreement in the body of the e-mail.  <u>See</u> Lee Decl. ¶ 16.  Unlike the Order Confirmation E-mail, which was addressed to "JONATHAN FERRIE," the version of the Customer Agreement E-mail that was produced for the record was addressed to "DIRECTV CUSTOMER."  <u>See</u> June 25 Customer Agmt. E-mail at 1.  The end of the e-mail says that "[t]his email was sent to *emailaddress*," <u>see id.</u> at 10, unlike the end of the June 25 Order Confirmation E-mail, which indicated that it had been sent to "Jonathan.Ferrie@gmail.com."

  Nevertheless, DIRECTV asserts that it can deduce that this e-mail was successfully delivered to Ferrie's e-mail inbox, by the same logic that it was able to deduce that the June 25 Order Confirmation E-mail was successfully delivered: the fact that the e-mail was retrieved from the archive when DIRECTV searched for Ferrie's file in the archives indicates that it was successfully delivered to his e-mail address.  <u>See</u> Lee Decl. ¶ 14 ("The fact that these documents are contained in the archive confirms that they were all successfully sent to Mr. Ferrie").  Further, DIRECTV explains that the lack of personalization in the archived version of the June 25 Customer Agreement E-

mail does not indicate that the e-mail was not successfully delivered to Ferrie's inbox. Rather, the lack of personalization is common to all archived Customer Agreement E-mails and is simply a function of how those e-mails are saved in the archive.  <u>See</u> Lee Decl. ¶ 12 ("The contents of the archived [customer agreement e-mails] are identical to those received by the customers . . . except that the archived copy does not include the personalization (<u>i.e.</u>, the salutation or the email address in the footer) that the customer sees when he or she opens the email"); <u>see</u> <u>also</u> Battaglini Decl. ¶ 7 (same).

iii.   June 26, 2013 e-mails

DIRECTV asserts that it e-mailed Ferrie an additional copy of both the Order Confirmation E-mail (which included the hyperlink to the Customer Agreement) and the Customer Agreement E-mail (which contained the Customer Agreement in the body of the e-mail) on June 26, 2013.  <u>See</u> Lee Decl. ¶ 18.  DIRECTV sent these additional e-mails because, in addition to signing up for television service through DIRECTV, Ferrie also "placed an order for a bundled package for telecommunications services through a telco" partner of DIRECTV, which additional order triggered the sending of these e-mails.  <u>Id.</u>  The June 26 Order Confirmation E-mail was nearly identical to the June 25 version, except that it made reference to Ferrie's purchase of bundled internet service. <u>See</u> <u>id.</u> Ex. 6 at 1 (Doc. No. 17-2) ("June 26 Order Confirmation E-mail").  The June 26 Customer Agreement E-mail was identical to the June 25 version, insofar as the entire body of the e-mail was the Customer Agreement.  <u>See</u> <u>id.</u> Ex. 7 (Doc. No. 17-2) ("June 26 Customer Agmt. E-mail").  Unlike the June 26 Order Confirmation E-mail, the June 26 Customer Agreement E-mail did not contain any reference to the fact that Ferrie was

9

receiving that e-mail because he had placed an order for bundled internet service.  See id.

iv.   Whether Ferrie received the Customer Agreement

DIRECTV has offered exhibits and testimonial evidence indicating that Ferrie received the Order Confirmation and Customer Agreement E-mails.  In response, Ferrie offers two arguments in an attempt to show that a genuine issue of material fact exists with regard to whether he received the e-mails.  The court will address these in turn.

First, Ferrie argues that, "I do not recall ever receiving and I certainly did not read the emails that DirecTV attached to its motion."  Jonathan Ferrie Decl. at ¶ 14. However, given that DIRECTV has introduced evidence indicating that Ferrie received the e-mails, Ferrie cannot create a genuine issue of material fact as to whether he received them solely by asserting that he does not "recall" receiving them.  See Vardanyan v. Close-Up Int'l, Inc., 315 Fed.Appx. 315, 317-18 (2d Cir. 2009) (party's "statement that he does not remember whether he signed the document does not conflict with the testimony and evidence that defendants have submitted about the terms of that agreement") (internal quotation marks omitted); Motiva Enter. LLC v. W.F. Shuck Petroleum, Civil Action no. 3:10-CV-793 (JCH), 2012 WL 601245, at *14 (D. Conn. Feb. 22, 2012) ("Shuck does not assert that he did not sign the document, nor have defendants adduced any evidence to support such an argument . . . Shuck's assertion that he does not remember signing the document is not, in itself, sufficient to create a material issue of fact to defeat Motiva's Motion for Summary Judgment"). Thus, Ferrie's assertion that he does not recall receiving the e-mails does not, without

more, create a genuine issue of material fact as to whether he received them.[4]

Alternatively, Ferrie argues that the lack of personalization in the archived versions of the Customer Agreement E-mails that DIRECTV has produced in its filings creates a genuine issue of material fact as to whether Ferrie ever received these e-mails.  See Pl.'s Mot. to Compel Opp'n at 14-15.  In support of this argument, Ferrie asserts that, "[n]one of DirecTV's declarants have personal knowledge of the sending or receipt of the DirectTV emails, and DirecTV's business records appear to be inconsistent."  Id. at 14.[5]  However, as already discussed, Lee and Battaglini provided independent sworn declarations in which they both provided the same explanation for why the archived versions of the Customer Agreement E-mails do not contain the personalization that the archived versions of the Order Confirmation E-mails contain. See Lee Decl. at ¶ 12; Battaglini Decl. at ¶ 7.  Further, Lee and Battaglini both testified that, based on the way the archive system works, the e-mails that they retrieved from the archive when they searched for Ferrie's account would not have been saved in the archive in the first place (and, thus, not retrievable) if the e-mails were not successfully delivered to Ferrie's inbox.  See Lee Decl. at ¶ 13; Battaglini Decl. at ¶ 7.  In sum, DIRECTV has introduced testimonial and documentary evidence that supports the conclusion that the Customer Agreement E-mails were successfully delivered to Ferrie's inbox.  Ferrie cannot create a genuine issue of material fact as to the successful

---

[4] It is noteworthy that Ferrie does not assert in his declaration that he did not receive the e-mails, but rather only that he does not remember receiving the e-mails.  See Jonathan Ferrie Decl. at ¶ 14.  On the other hand, Ferrie does assert that he did not receive the hard-copy letters that DIRECTV claims it sent him, see id. ¶ 16, which indicates that Ferrie's failure to assert that he did not receive the e-mails was not the product of mere oversight, but rather was intentional.

[5] Although Ferrie's memorandum is not entirely clear in this regard, the court believes that his claim that DIRECTV's business records are inconsistent derives from the fact that the Customer Agreement E-mail does not contain the personalization that appears in the Order Confirmation E-mail.

11

delivery of these e-mails solely by pointing to the lack of personalization in the e-mails,

given the fact that DIRECTV has introduced affirmative evidence that explains why this

lack of personalization does not support the conclusion that the e-mails were not

delivered to Ferrie's inbox.  Thus, there exists no genuine issue of material fact with

regard to whether the Order Confirmation and Customer Agreement E-mails were

successfully delivered to Ferrie's inbox.[6]

              v.    Whether Ferrie assented to the Customer Agreement

Ferrie argues that, even assuming he did receive a copy of the Customer

Agreement, he never assented to be bound by it.

The first paragraph of the Customer Agreement, which is written in all capital

letters, states the following:

> THIS DESCRIBES THE TERMS AND CONDITIONS OF YOUR
> RECEIPT OF AND PAYMENT FOR DIRECTV® SERVICE AND IS
> SUBJECT TO ARBITRATION (SECTION 9) AND DISCLAIMER OF
> WARRANTIES (SECTION 8).  IF YOU DO NOT ACCEPT THESE
> TERMS, PLEASE NOTIFY US IMMEDIATELY AND WE WILL
> CANCEL YOUR ORDER OR SERVICE SUBJECT TO
> APPLICABLE CANCELLATION TERMS AND/OR FEES (SECTION
> 5).  IF YOU INSTEAD DECIDE TO RECEIVE OUR SERVICE, IT
> WILL MEAN THAT YOU ACCEPT THESE TERMS AND THEY
> WILL BE LEGALLY BINDING.

June 25 Customer Agmt. E-mail at 1.  Based on the language of this paragraph,

DIRECTV argues that Ferrie accepted the terms and conditions contained in the

---

[6] The fact that no genuine issue of material fact exists with regard to whether the Customer Agreement E-mails were successfully delivered to Ferrie's inbox means that the court need not address Ferrie's argument that "emails with only hyperlinks [i.e. the Order Confirmation E-mails] are a form of impermissible 'browsewrap' and do not put individual consumers on reasonable inquiry notice of the terms of the agreement."  Pl.'s Mot. to Compel Opp'n at 12.  This is because, even assuming, arguendo, that the Order Confirmation E-mails did not put Ferrie on notice of the Customer Agreement because of the use of hyperlinks, the Customer Agreement E-mails, which contained the full Customer Agreement in the body of the e-mail and made reference to the arbitration provision on the first page, surely did put Ferrie on notice of the Customer Agreement.

Customer Agreement by accepting service, rather than cancelling his order prior to the installation and activation of service.  See Def.'s Mot. to Compel Mem. in Supp. at 9. Ferrie, on the other hand, argues that his "silence," i.e. his failure to cancel his order, does not constitute a manifestation of assent to the Customer Agreement.  Pl.'s Mot. to Compel Opp'n at 10.  Although silence can constitute a manifestation of assent, and although "[a] person can assent to terms even if he or she does not actually read them . . . an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious."  Schnabel v. Trilegiant Corp., 697 F.3d 110, 123 (2d Cir. 2012) ("Trilegiant II").

Because Ferrie accepted service, and because DIRECTV informed Ferrie that accepting service constituted acceptance of the Customer Agreement, on first blush it seems clear that Ferrie assented to the Customer Agreement.  However, this is the case only if Ferrie was aware of the Customer Agreement and its contractually binding nature before he "accepted" it by accepting service.  Unsurprisingly, then, Ferrie argues that he was unaware of, and had no reason to be aware of, the additional contractual terms contained in the Customer Agreement prior to the installation of service.  See Pl.'s Mot. to Compel Opp'n at 6-9.  He relies on Schnabel v. Trilegiant Corp., No. 3:10-CV-957 JCH, 2011 WL 797505 (D. Conn. Feb. 24, 2011) ("Trilegiant I") and Schnabel v. Trilegiant Corp., 697 F.3d 110 (2d Cir. 2012) ("Trilegiant II"), as support for his argument that he was not on inquiry notice of the additional terms, and, as a result, his failure to cancel service did not constitute his assent to the Customer Agreement.

13

In Trilegiant, the plaintiffs, after making online purchases from third-party companies, unwittingly signed up for membership in the defendant's discount program, and authorized the company to bill their credit cards automatically on a monthly basis. See Trilegiant I at *1.  Upon signing up, the plaintiffs were directed to a screen which said, among other things, "[w]atch for your welcome email, arriving soon."  Id.  Shortly after signing up, the plaintiffs received an email, which the district court described as follows:

> The email's subject is "Welcome to Great Fun!," and it opens with a message explaining [the plaintiff's] membership, including access information and [the plaintiff's] account number and username. There is also the image of a membership card.  No mention is made of terms and conditions in the opening welcome message, but at the bottom of the email, in smaller font, is a section describing itself as "Great Fun Membership Terms & Conditions." These terms and conditions purport to describe an agreement made between Trilegiant and "the person specified in the [Great Fun] membership card."  Within these terms and conditions is an arbitration clause.

Id. at * 2 (internal citations omitted).  The defendant argued that the plaintiffs had accepted the terms and conditions in the e-mail by not cancelling their subscriptions upon receipt of the e-mail.  See id. at *3.  This court, however, noted that the plaintiffs "were never given the opportunity to 'reject' the email they eventually received," or the arbitration clause contained therein.  Id. at *5.

The district court, and the Court of Appeals for the Second Circuit affirming, determined that the plaintiffs had not assented to the additional terms and conditions in the e-mail.  The Court of Appeals noted that, "the touchstone of the analysis is whether reasonable people in the position of the parties would have known about the terms and the conduct that would be required to assent to them."  Trilegiant II, 697 F.3d at 124.

Because the Trilegiant plaintiffs were clearly not on actual notice of the terms, the court focused its analysis on whether the plaintiffs were on inquiry notice of the terms. "Inquiry notice is actual notice of circumstances sufficient to put a prudent man upon inquiry." Id. at 120.  Factors relevant to determining whether a party was on inquiry notice of additional terms include, but are not limited to, "the conspicuousness of the term, the course of dealing between the parties, and industry practices."  Id.  Thus, Trilegiant II advocates for a circumstance-specific analysis of whether a party was on notice of additional terms.  Despite Ferrie's suggestion at oral argument, Trilegiant did not announce a rigid, bright-line rule to the effect that a party can only have adequate notice of later-delivered terms if the party was put on notice of such terms during the initial phase of contract negotiation.

        The circumstances of this case differ significantly from those present in the Trilegiant case.  In this case, the court concludes that a reasonable person in Ferrie's position would have been on inquiry notice of the additional terms contained in the Customer Agreement, and of what conduct would be viewed by DIRECTV as constituting assent to those additional terms.

        One of the most obvious differences between this case and Trilegiant is that DIRECTV's arbitration provision was drastically more conspicuous than was Trilegiant's arbitration provision.  As already mentioned, at the very top of the Customer Agreement is a paragraph, written entirely in capital letters, that begins as follows:

            THIS DESCRIBES THE TERMS AND CONDITIONS OF YOUR
            RECEIPT OF AND PAYMENT FOR DIRECTV® SERVICE AND IS
            SUBJECT TO ARBITRATION (SECTION 9) AND DISCLAIMER OF
            WARRANTIES (SECTION 8).  IF YOU DO NOT ACCEPT THESE
            TERMS, PLEASE NOTIFY US IMMEDIATELY AND WE WILL
            CANCEL YOUR ORDER OR SERVICE SUBJECT TO

15

APPLICABLE CANCELLATION TERMS AND/OR FEES (SECTION 5).  IF YOU INSTEAD DECIDE TO RECEIVE OUR SERVICE, IT WILL MEAN THAT YOU ACCEPT THESE TERMS AND THEY WILL BE LEGALLY BINDING.

June 25 Customer Agmt. E-mail at 1.  Although the details of the arbitration provision are spelled out more fully in Section 9 of the Customer Agreement, the existence of the arbitration provision is declared immediately at the outset of the e-mail.  Further, the Order Confirmation E-mail also informs the reader, very clearly and at the outset of the e-mail, that the email contains important contractual information.  The Order Confirmation E-mail contains three numbered paragraphs – the first advises the reader to review the order details provided in the e-mail; the second advises the reader to confirm the installation appointment; and, the third advises the reader to review both the Customer Agreement and other "Terms and Conditions."  See June 25 Order Confirmation E-mail at 1.  Both the phrase "Customer Agreement" and "Terms and Conditions" are hyperlinks.  On the other hand, in the "welcome email" sent by the defendant in Trilegiant, "[n]o mention is made of terms and conditions in the opening welcome message, but at the bottom of the email, in smaller font, is a section describing itself as 'Great Fun Membership Terms & Conditions.' "  Trilegiant I, at *2.

Another notable difference between this case and Trilegiant is that DIRECTV's e-mails specifically tell the customer how he can reject the terms of the Customer Agreement, and what action will constitute acceptance.  In this case, DIRECTV's Customer Agreement says that the customer can reject the terms and conditions contained in the Customer Agreement by calling DIRECTV and cancelling his order or service.  See June 25 Customer Agmt. E-mail at 1.  The Customer Agreement also notifies the customer that, if he receives service, such receipt will constitute acceptance

16

of the Customer Agreement's terms and conditions.  See id.  In Trilegiant, the defendant "effectively obscured the details of the terms and conditions and the passive manner in which they could be accepted."  Trilegiant II, 697 F.3d at 127.[7]

Yet another difference between this case and Trilegiant is that in this case, the arbitration provision was not as "temporally and spatially decoupled from [Ferrie's] enrollment in and use of [DIRECTV]" as was the arbitration provision in Trilegiant. Trilegiant II, 697 F.3d at 127.  In Trilegiant, the plaintiffs had, without a doubt, already taken all the steps that they needed to take in order to become enrolled in Trilegiant's program.  As a result, Trilegiant customers "would not be forced to confront the terms while enrolling in or using the service or maintaining their memberships.  In this way, the transmission of the arbitration provision lacks a critical element of shrinkwrap contracting – the connection of the terms to the goods (in this case the services) to which they apply."[8]  Id.  The case at bar falls somewhere between the circumstances of

---

[7] To be clear, the court is focused here on the first part of the quoted sentence from Trilegiant II, in which the court notes that Trilegiant "effectively obscured the details of the terms and conditions."  It clear that DIRECTV did not obscure the details of arbitration provision, nor did it obscure the ways by which a customer could accept or reject it.

That said, whether the steps a customer could take to accept or reject the arbitration provision here were materially less passive than the actions that Trilegiant believed would constitute acceptance in its case is a closer call.  In Trilegiant, the defendant argued that the plaintiffs assented to the arbitration provision by not cancelling their membership.  See Trilegiant I at *3.  In other words, Trilegiant argued that the plaintiffs accepted the additional terms by doing nothing at all.  Here, somewhat similarly, DIRECTV informed customers that they would be deemed to have accepted the Customer Agreement if they accepted DIRECTV service.  See June 25 Customer Agmt. E-mail at 1.  For new customers like Ferrie, accepting service meant allowing the equipment that he had already ordered over the phone to be installed.  On the telephone call, Ferrie had also scheduled a date and time for the installation to take place.  While allowing a DIRECTV installer to come into your home and install equipment is less passive an endeavor than simply doing nothing, it is still largely passive.  Ferrie had already set up the installation appointment, and he did not need to take any further, affirmative steps to confirm the installation.  And, because allowing the installation to go forward constituted assent to the Customer Agreement, Ferrie effectively did not have to do anything more to accept the Customer Agreement, in DIRECTV's eyes, than simply letting the already-scheduled appointment occur as planned.  Nevertheless, because the court finds that the circumstances of this case differ in enough other ways from the circumstances of Trilegiant, this similarity is insufficient for Ferrie to prevail.

Trilegiant and a traditional shrinkwrap case.  Obviously, Ferrie was not "forced" to confront the Customer Agreement prior to the installation of his service, unlike a customer in a traditional shrinkwrap case.  Indeed, Ferrie has attested that he never confronted the Customer Agreement prior to installation.  See Jonathan Ferrie Decl. at ¶ 14.  However, equally clear is that Ferrie had not yet completed the process of receiving DIRECTV service when the Customer Agreement was e-mailed to him.  The Customer Agreement was e-mailed after Ferrie had agreed, in principle, to receive DIRECTV service, but before DIRECTV actually installed the equipment necessary for Ferrie to receive service and before Ferrie's first billing cycle commenced.  Further, the Customer Agreement was first referenced, and hyperlinked to, in the Order Confirmation E-mail, which e-mail directly pertained to the last step in the process – the installation.  This is because the Order Confirmation E-mail confirmed what services were going to be installed and confirmed the date and time of the installation.  See June 25 Order Confirmation E-mail at 1-2.  In this sense, although the events in this case are not wholly analogous to the events that occur in a shrinkwrap case, they are quite difference from the events that occurred in Trilegiant.

Of course, Ferrie argues that the conspicuousness of the existence of the arbitration provision, the conspicuousness of the instructions as to how it could be

---

[8] "Shrinkwrap contracting" or "shrinkwrap licensing" refers to a common method by which an offering party presents contract terms to an offeree.  In a "shrinkwrap" case, the additional terms are included with the product the customer ordered in a single package.  When the customer opens the package containing the product he ordered, he is confronted with the additional terms, thereby providing courts with a degree of assurance that the customer received the additional terms.  See Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 428 (2d Cir. 2004) ("A shrinkwrap license typically involves (1) notice of a license agreement on product packaging (i.e., the shrinkwrap), (2) presentation of the full license on documents inside the package, and (3) prohibited access to the product without an express indication of acceptance.  Generally, in the shrinkwrap context, the consumer does not manifest assent to the shrinkwrap terms at the time of purchase; instead, the consumer manifests assent to the terms by later actions").

accepted or rejected, and the timing of the e-mails, are immaterial because he was never put on notice that he would be receiving additional contractual terms via e-mail in the first place.  See Pl.'s Mot. to Compel Opp'n at 7-8.  To be sure, there is some language in Trilegiant II that would tend to support Ferrie's argument.  Specifically, the Trilegiant II court noted that "there was no prior relationship between the parties that would have suggested that terms sent by email after the initial enrollment were to become part of the contract."  Trilegiant II, 697 F.3d at 126.  However, as mentioned earlier, this court does not read Trilegiant II as standing for the strict proposition that the only way a party can be put on inquiry notice of later-delivered contractual terms sent via e-mail is if the opposing party explicitly indicates that such terms will be later-delivered via email.  Rather, this court reads Trilegiant II as standing for the proposition that courts must look at the facts specific to each case to determine whether a reasonable person in the plaintiff's position would have been – based, inter alia, on the parties' prior course of dealing, industry practices, and the conspicuousness of the additional terms – on inquiry notice of the additional terms.

As already discussed, the conspicuousness of the arbitration agreement in this case differs significantly from the conspicuousness of the arbitration agreement in Trilegiant.  Additionally, the course of dealing between Ferrie and DIRECTV that preceded DIRECTV's transmission of the Order Confirmation and Customer Agreement E-mails differed significantly and materially from the course of dealing that preceded the sending of the "welcome email" in Trilegiant.  In Trilegiant, there was disputed evidence as to whether the plaintiffs ever gave the defendant their e-mail addresses when they were signing up for membership.  See Trilegiant I, at *1-2 (one plaintiff admits providing

his e-mail address, while the other does not). Further, although there was evidence introduced in that case that the customers, after unwittingly signing up for the defendant's services, were redirected to a confirmation page that advised customers to "[w]atch for your welcome email, arriving soon," this was the only advance notice that Trilegiant provided customers of the "welcome e-mail." See id. Given these circumstances, the Trilegiant II court described the "welcome email" as "unsolicited." Trilegiant II, 697 F.3d at 123. In this case, Ferrie provided DIRECTV with his e-mail address after the DIRECTV representative informed him that DIRECTV would be sending Ferrie the Order Confirmation E-mail to the address he provided. See Tr. of DIRECTV Call at 15:15-22. And, the Order Confirmation E-mail itself alerts the customer to the forthcoming Customer Agreement E-mail by telling customers that DIRECTV will be e-mailing the Customer Agreement E-mail within 24 hours. See June 25 Order Confirmation E-mail at 1. Thus, Ferrie was not informed of the Customer Agreement, and its arbitration provision, through an unsolicited e-mail. Rather, he was informed of the Customer Agreement in an e-mail that he was specifically told he was going to receive, and for which he provided his e-mail address. See e.g., Valle v. ATM Nat'l, LLC, No. 14-cv-7993 (KBF), 2015 WL 413449, at *3 (S.D.N.Y. Jan. 30, 2015) ("Rather than burying the arbitration provision in an unexpected email, here BPNA mailed the Amended Agreement to the address regularly used to communicate with its customers").

Further, although DIRECTV did not explicitly tell Ferrie "that this email will include the terms and conditions of the agreement that was just entered into," Trilegiant I at *4, there is a material difference between an Order Confirmation e-mail, and a "welcome

email," especially considering the circumstances of this case.  In <u>Trilegiant</u>, the "welcome email" was sent to two customers who did not even fully appreciate that they had entered into a contract with the company that sent the e-mail.  In this case, however, Ferrie's entire claim is premised on his argument that he believed that all of the contract terms that governed his two-year contract with DIRECTV were discussed over the phone.  Taking Ferrie's representation at face value, as the court must at this stage, it seems obvious that a reasonable person in Ferrie's position would have viewed the Order Confirmation E-mail as significant, insofar as it represented the only memorialization of what Ferrie believed to be a completed contract.  Additionally, at no point in the phone call did DIRECTV provide Ferrie with a confirmation number, or any other information that would allow Ferrie to reference his order, in the event that he needed to call DIRECTV and follow-up.  The only time he received such information was in the Order Confirmation e-mail, which provided Ferrie with an order confirmation number and an account number.  In this context, a reasonable person in Ferrie's position would have been on notice that the Order Confirmation E-mail contained important information, even if he was not on notice that it contained additional contractual terms.  And, given the court's conclusion that a reasonable person in Ferrie's position would have been on notice that the Order Confirmation E-mail contained important information, the court also concludes that a reasonable person would not completely ignore such an e-mail.

When a customer is specifically told that he is going to get an Order Confirmation E-mail, when the Order Confirmation E-mail is the only record of the interaction the customer just had with the company, when the Order Confirmation E-mail

conspicuously refers to additional terms and to the Customer Agreement E-mail, and when the Customer Agreement E-mail conspicuously refers to the arbitration provision, there is strong evidence that the customer has been put on inquiry notice of the existence of the arbitration provision. <u>See</u> <u>Trilegiant II</u>, 697 F.3d at 120 ("[i]nquiry notice is actual notice of <u>circumstances</u> sufficient to put a prudent man upon inquiry") (emphasis added). This is so even if the customer never expected the Order Confirmation E-mail to contain additional terms, precisely because the existence of additional terms is so conspicuously announced once the customer opens the Order Confirmation E-mail.

Even if a reasonable person in Ferrie's position might not have thought that an Order Confirmation E-mail was sufficiently important for him to read, DIRECTV made other comments on the telephone call that would have put a reasonable person in Ferrie's position on notice that potentially important documents were going to be sent to his e-mail. DIRECTV told Ferrie that, by signing up for paperless billing, he acknowledged that he would only receive his "monthly billing statements at the e-mail address [he] provided." Tr. of DIRECTV Call at 29:21-30:3. DIRECTV also told Ferrie that the price he was agreeing to would not be his final price, because it did not include "applicable state tax and local fees and local taxes." <u>Id.</u> at 29:7-10. Ferrie has repeatedly stressed how important a factor DIRECTV's price was for him as a potential buyer. <u>See</u> Jonathan Ferrie Decl. at ¶ 2 ("Price was naturally one of the especially important considerations to me"); Pl.'s Mot. to Compel Opp'n at 2 ("After viewing DirecTV's advertisements, including especially their prices, Ferrie decided to set up an account with DirecTV"). However, given that price was paramount to Ferrie, given that

he was told the price he agreed to on the phone would be lower than the total price after taxes, and given that Ferrie was told that the only way he would be able to view his bill was by accessing it through the e-mail account he provided, it seems obvious to the court that a reasonable person in Ferrie's position would have realized that documents that were important to Ferrie (e.g., his bill) would have been sent to his e-mail address.[9] And, once Ferrie was on notice that important documents were going to be sent to his e-mail address, he was on notice to not completely ignore all e-mails from DIRECTV. And, had Ferrie not ignored the e-mails from DIRECTV, but rather had he even cursorily reviewed the Order Confirmation and Customer Agreement E-mails, he would have learned of the existence of the additional terms and the arbitration provision.

Lastly, there is evidence in the record to suggest that Ferrie would have been on inquiry notice of the additional terms even before he called DIRECTV.  Prior to contacting DIRECTV, Ferrie conducted online research and "looked at DirecTV's various advertisements for their programming packages and the associated pricing for each package."  Jonathan Ferrie Decl. at ¶¶ 2-3.  Ferrie asserts that, in the process of conducting his research he "never saw or reviewed DirecTV's Customer Agreement." Id.  However, DIRECTV has introduced evidence that:

---

[9] Although Ferrie did not, as a matter of fact, need to view his bill in order to pay it (because he enrolled in Auto-Bill Pay) that does not mean that a reasonable person in Ferrie's position would have, as a result, discarded the copy of the bill as unimportant.  Rather, viewing the itemized bill seems to be the most obvious way that someone would confirm that the amount he was being charged comported with the amount he believed he ought to have been charged.  Given that Ferrie has emphasized how important price was to him, it seems unremarkable that a reasonable person in Ferrie's position might be interested in confirming that fact.  And, while Ferrie could have viewed his credit statements to confirm whether he was being billed what he believed to be the correct amount, he had agreed to a fixed amount (i.e. $59.99 for the first 12 months), plus an unspecified amount for fees and taxes.  Reviewing the itemized bill sent from DIRECTV would be the only way for Ferrie to see specifically what he was being charged for, which is critical if one believes he is being overcharged.

> Webpages that advertise DIRECTV customer offers and pricing include a standard disclosure, which can be accessed through a hyperlink labeled "Additional Details" or "Additional Offers Details," that contains the terms and conditions associated with subscribing to the DIRECTV services.  In June 2013, when Mr. Ferrie alleges that he reviewed DIRECTV advertisements online, this "Additional Details" disclosure stated that: "Receipt of DIRECTV programming subject to DIRECTV Customer Agreement; copy provided at directv.com/legal and in order confirmation."

Def.'s Mot. to Compel Reply Ex. 2 at ¶ 5 (Doc No. 21-2) ("Campain Decl.").  Thus, unlike the customers in <u>Trilegiant</u>, who had no way of knowing about the additional terms prior to entering into their initial agreement with Trilegiant, Ferrie could have readily acquainted himself with the terms and conditions of the Customer Agreement prior to initiating a contractual relationship with DIRECTV.

The undisputed evidence supports the conclusion that a reasonable person in Ferrie's position would have known about the arbitration provision and what conduct would have constituted assent to provision.  Even though DIRECTV never explicitly told Ferrie during their initial telephone call that it would be e-mailing Ferrie the Customer Agreement, and that the Customer Agreement contained additional contractual terms, Ferrie was nevertheless placed on inquiry notice.  Ferrie was on actual notice that he would be receiving the Order Confirmation E-mail, and the Order Confirmation E-mail explicitly refers to the existence of additional terms, as well as to the Customer Agreement.  Further, the Customer Agreement itself explicitly calls to the customer's attention the existence of the arbitration provision.  More generally, Ferrie was on notice that he should not ignore e-mails sent to him from DIRECTV, because DIRECTV had informed him that it would be sending him e-mails that a reasonable person in Ferrie's position would likely deem important.  These include the Order Confirmation E-mail,

which provided Ferrie with the only piece of documentation confirming what he had agreed to over the telephone, and the e-mail with Ferrie's bill.  As discussed above, given how important price was to Ferrie, and the fact that the price agreed to over the phone was not the final price, but rather only the base price before the imposition of taxes and fees, a reasonable person in Ferrie's position would not think it reasonable to ignore all e-mails he received from DIRECTV.

Thus, the court concludes that Ferrie was on inquiry notice of the arbitration provision and what steps he could take to reject the provision.  Because Ferrie did not take the steps necessary to reject the arbitration provision, but rather took the steps that DIRECTV told him would constitute assent, the court concludes that Ferrie assented to the arbitration agreement.

### 2.      Whether the arbitration agreements are valid

Having concluded that no genuine issue of material fact exists as to whether Ferrie assented to the arbitration provisions contained in both the ELA and the Customer Agreement, the court must also consider whether these arbitration provisions are valid.

The FAA's "saving clause permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (internal quotation marks omitted).  However, "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445-46 (2006).  This distinction between challenges to the arbitration clause specifically and challenges to the contract

that contains the arbitration clause generally arises from the fact that section 2 of the FAA "states that a 'written provision' 'to settle by arbitration a controversy' is valid, irrevocable, and enforceable' <u>without mention</u> of the validity of the contract in which it is contained.  Thus, a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate."  <u>Rent-A-Center, West, Inc. v. Jackson</u>, 561 U.S. 63, 70 (2010) (emphasis in the original).  In short, because "an arbitration provision is severable from the remainder of the contract," <u>Buckeye Check Cashing</u>, 546 U.S. at 445, unless the arbitration provision is specifically attacked as unenforceable, courts will enforce the arbitration provision and require an arbitrator, rather than the court, to decide whether the contract as a whole is unenforceable.  "Claims of unconscionability and adhesion contracts are similarly included within" this rule.  <u>JLM Indus., Inc.</u>, 387 F.3d at 170.

Ferrie raised an unconscionability argument in his opposition to the Motion to Compel.  The heading of the section in which this argument is presented is titled: "DirecTV's Customer Agreement and Arbitration Clause Are Substantively and Procedurally Unconscionable."  <u>See</u> Pl.'s Mot. to Compel Opp'n at 15.  However, that is the last time that Ferrie's argument with regard to unconscionability even mentions the arbitration provision.  Rather, his argument is aimed entirely at how the Customer Agreement, as a whole, is unconscionable.  Indeed, Ferrie identifies nine distinct ways in which the Customer Agreement is unconscionable, not one of which attacks the arbitration provision specifically.  <u>See</u> <u>id.</u> at 15-16.  For example, Ferrie argues that the Customer Agreement is unconscionable because: (1) DIRECTV and Ferrie have unequal bargaining power; (2) the Customer Agreement is an adhesion contract; (3)

DIRECTV deceives customers into thinking that the terms of their contract with

DIRECTV were concluded on the phone; (4) DIRECTV did not tell Ferrie that additional

terms and conditions would be received via e-mail or mail; (5) DIRECTV's e-mails

containing the Customer Agreement do not require Ferrie to "expressly register his

agreement . . . by clicking a link or otherwise"; (6) DIRECTV asks customer to sign the

Customer Agreement only after the installer has installed the equipment; (7) DIRECTV

deceived Sarah Ferrie as to what she was signing; (8) DIRECTV did not tell Ferrie that

he or his "agent for contracts" needed to be present for the installation; and, (9)

DIRECTV did not ask Sarah Ferrie whether Ferrie had given her authority to sign

contracts on his behalf.  Id. at 15-16.  As is patently evident, all of these arguments

speak to why the Customer Agreement, as a whole, is unconscionable, rather than why

the arbitration provision is unconscionable.  Ferrie's failure to key his argument to the

arbitration provision, rather than to the Customer Agreement as a whole, is fatal to his

argument of unconscionability that is before this court.  See Campaniello Imps., Ltd. v.

Saporiti Italia S.p.A., 117 F.3d 655, 667 (2d Cir. 1997) (In order for the court to have the

authority to decide whether the arbitration provision is enforceable – rather than the

arbitrator – there must be "some substantial relationship between the fraud or

misrepresentation and the arbitration clause in particular").[10]

Accordingly, it is for the arbitrator, not the court, to determine whether the

arbitration agreement is invalid by virtue of the fact that the Customer Agreement, as a

whole, is unconscionable.  This finding is buttressed by the fact that, because DIRECTV

---

[10] In his Sur-Reply, Ferrie has attempted to cure this deficiency.  However, his argument is not responsive to any new evidence introduced by DIRECTV in connection with its Reply Brief, or any new issues raised by the new evidence.  Therefore, the court will not consider this argument.  See supra n. 1.

has proffered evidence indicating that Ferrie's claims are subject to mandatory

arbitration, the burden is on Ferrie to prove otherwise.  This shift in burden extends to

arguments that the arbitration agreement is invalid.  See, e.g., Lombardi v. DirecTV,

Inc., 549 Fed.Appx. 617, 619 (9th Cir. 2013) ("under Pennsylvania law, the party

seeking to invalidate an arbitration agreement bears the burden of proving that it is

unconscionable . . ."); Joliat v. Majella Found., Civil No. 3:13-cv-00551(AWT), 2013 WL

495284, at *1 (D. Conn. Feb. 6, 2013) (Under Texas law, "once a party meets the

burden of presenting evidence of an arbitration agreement governing the dispute

between the parties, the burden shifts to the opposing party to present evidence that the

arbitration agreement is unconscionable"); Eyewonder, Inc. v. Abraham, No. 08 CV

3579 (GBD), 2010 WL 3528882, at *1 n. 2 (S.D.N.Y. Sept. 3, 2010) (Under California

law, "[t]he party who is opposing the arbitration has the burden of proving the arbitration

provision is unconscionable").  Ferrie has not shown that his unconscionability argument

specifically attacks the arbitration provision, rather than the Customer Agreement

generally.  Accordingly, whether the Customer Agreement, and its arbitration provision,

is invalid because the Customer Agreement is unconscionable is for an arbitrator, not

the court, to decide.

> 3.      Whether the dispute is within the scope of the arbitration agreement

The arbitration agreement contained in the Customer Agreement is broadly

worded.  The Customer Agreement states that, "[i]n order to expedite and control the

cost of disputes, you and we agree that any legal or equitable claim relating to this

Agreement, any addendum, or your Service" will be resolved either informally, or

through arbitration.  June 25 Customer Agmt. E-mail at 9.  It is clear that this dispute relates to Ferrie's DIRECTV service.  Ferrie does not argue otherwise.

                    4.     Conclusion

Based on the foregoing, the court determines that Ferrie's CUTPA claim falls within the scope of the mandatory arbitration provision, to which Ferrie agreed.  As a result, Ferrie's claim, including that the Customer Agreement is unconscionable, is subject to arbitration, rather than judicial resolution.  The Motion to Compel (Doc. No. 17) is granted.  The Motion to Stay Discovery (Doc. No. 18) is terminated as moot. The Motion for Leave to File Sur-Reply (Doc. No. 24) is granted in part, to the extent discussed above.[11]

## III.    MOTION TO AMEND

After DIRECTV produced an audio recording of the telephone call in which Ferrie ordered his DIRECTV service, Ferrie sought leave to amend his Complaint to include allegations that DIRECTV illegally recorded the telephone call.  See Prop. Am. Compl.

---

[11] As discussed in the Facts section, see supra § II, DIRECTV has introduced evidence that, in addition to e-mailing Ferrie the Order Confirmation and Customer Agreement E-mails, it also sent Ferrie hard-copy versions of both documents via regular mail.  Although the record does not contain any evidence that definitively proves that the letter, which was sent to Ferrie's Prospect, Connecticut home, was successfully delivered there, Connecticut's "mailbox rule" "provides that a properly stamped and addressed letter that is placed into a mailbox or handed over to the United States Postal Service raises a rebuttable presumption that it will be received." Echavarria v. Nat'l Mut. Ins. Co., 275 Conn. 408, 418 (Conn. 2005).  That said, Ferrie has submitted a sworn declaration in which he states, "I never received this letter from DirecTV," Jonathan Ferrie Decl. at ¶ 16, which is materially different to his saying that he "do[es] not recall ever receiving" the Order Confirmation and Customer Agreement E-mails, id. at ¶ 14. Connecticut law is unsettled with regard to whether a sworn denial of receipt rebuts the presumption and creates a genuine issue of material fact regarding the receipt of the mailing.  Compare Provident Funding Assocs., L.P. v. Sohn, No. FBTCV136037272S, 2015 WL 467412, at *4-5 (Conn. Super. Ct. Jan. 12, 2015) (sworn statement denying receipt sufficient to rebut presumption) with AIG Cas. Co. v. Schweiger, No. HHDCV084035100S, 2009 WL 3416139, at *6 (Conn. Super. Ct. Sept. 17, 2009) ("[a] simple denial of receipt is not sufficient to rebut the presumption"); see also Capone v. Electric Boat Corp., Civil Action No. 3:06-cv-1249 (JCH), 2006 WL 3741116, at *4 (D. Conn. Dec. 19, 2006) (noting split in authority but concluding that "[t]he trend in the Connecticut trial courts appears to be that an addressee's denial of receipt raises an issue of fact for the jury").  In light of Ferrie's sworn declaration and the unsettled nature of Connecticut law on this issue, the court declines to rely on DIRECTV's mailing of the Order Confirmation and Customer Agreement as a basis for the court's decision today.

at 11-17.  DIRECTV opposes Ferrie's Motion on the ground that amendment would be

futile because the additional claims are also subject to mandatory arbitration.  Ferrie

argues that amendment is not futile because the new claims fall outside the scope of

the arbitration agreement.[12]  See Memorandum of Law in Support of Motion to Amend

the Complaint at 5 (Doc. No. 31-2) ("Pl.'s Mot. to Amend Mem. in Supp.").  Ferrie does

not dispute that if, indeed, the court finds that the additional claims fall within the

arbitration agreement, then amendment would be futile.

"[A]rbitration is a matter of contract and a party cannot be required to submit to

arbitration any dispute which he has not agreed so to submit."  Howsam v. Dean Witter

Reynolds, Inc., 537 U.S. 79, 83 (2002) (quoting United Steelworkers of Am. v. Warrior &

Gulf Nav. Co., 363 U.S. 574, 582 (1960)).  That said, "where the contract contains an

arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to

arbitrate the particular grievance should not be denied unless it may be said with

positive assurance that the arbitration clause is not susceptible of an interpretation that

covers the asserted dispute.' "  AT&T Techs., Inc. v. Commc'ns Workers of Am., 475

U.S. 643, 650 (1986) (quoting Warrior & Gulf, 363 U.S. at 582-83).  Further, "[d]oubts

should be resolved in favor of coverage."  Id. (quoting Warrior & Gulf, 363 U.S. at 583).

The arbitration provision contained in the Customer Agreement reads as follows:

"you and we agree that any legal or equitable claim relating to this Agreement, any

addendum, or your Service" will be resolved either informally, or through arbitration.

Customer Agmt. at 9.  DIRECTV asserts that Ferrie's additional claims, which arise out

---

[12] Ferrie also argues that amendment is not futile because he never agreed to the Customer
Agreement and because the Customer Agreement, and its arbitration provision, are unenforceable.  See
Plaintiff's Reply Brief in Support of Motion to Amend at 1-2 (Doc. No. 36) ("Pl.'s Mot. to Amend Reply").
Because the court has already addressed both of these arguments, it need not repeat that analysis here.

of DIRECTV's recording of the telephone call between Ferrie and DIRECTV, relates to Ferrie's DIRECTV "Service," thereby placing these claims within the scope of the arbitration provision.  See DIRECTV's Opposition to Plaintiff's Motion to Amend the Complaint at 7 (Doc. No. 35) ("Def.'s Mot. to Amend Opp'n").  The word "Service" refers to "digital satellite entertainment programming and services."  See June 25 Customer Agmt. E-mail at 1.

Ferrie argues that DIRECTV's alleged commission of an invasion of privacy tort does not relate to Ferrie's DIRECTV "Service."  See Pl.'s Mot. to Amend Mem. in Supp. at 5.  Rather, Ferrie argues that, "[j]ust as Ferrie would not have to arbitrate a negligence claim if a DirecTV driver rear-ended Ferrie's car in his driveway during the installation, Ferrie does not have to arbitrate a claim that DirecTV illegally recorded his telephone conversations."  Pl.'s Mot. to Amend Reply at 2.

Regardless of whether or not the tortious conduct described by Ferrie's hypothetical would fall within the scope of the arbitration provision contained in the Customer Agreement, DIRECTV's act of recording of Ferrie's phone call is materially different than a driver's act of negligently crashing into Ferrie's car.  One of the reasons DIRECTV records its telephone calls with customers is to commemorate what was said during the call, in the event that a dispute arises later regarding what was said during a phone call.  See Declaration of José Cárdenas in Support of DIRECTV's Motion to Dismiss and/or Stay Proceedings Pending Arbitration and to Compel Arbitration at 1-2 (Doc. No. 20) ("My team in Sales Training Operations uses these call recordings for several purposes . . . . [I]f a customer has a complaint that relates to his or her initial

sales call, my team will review that call recording in order to verify what happened during that sales call and respond to the customer's complaint").

This justification makes sense, especially given what Ferrie and DIRECTV discussed over the phone.  During the phone call between Ferrie and DIRECTV, Ferrie signed up for a number of services and was quoted prices for those services.  See generally Tr. of DIRECTV Call.  DIRECTV also made a number of other representations and promises during the phone call.  See generally id.  After the phone call, DIRECTV sent Ferrie a sample bill which reflected the services for which Ferrie had signed up and their associated pricing.  See June 25 Order Confirmation E-mail at 1-2.  If, upon receiving this e-mail, Ferrie believed that the e-mail misrepresented what he had signed up for, the only record that would confirm what, in fact, he had signed up for during the telephone call would be the audio recording of the call.  In other words, the audio recording would be used to confirm for what combination of "digital satellite entertainment programming and services" Ferrie had signed up.

In this scenario, then, it is clear that the act of recording the telephone call can be viewed as relating to the "digital satellite entertainment programming and services" i.e. the "Service" for which Ferrie had signed up.[13]  Thus, because the court cannot say with

---

[13] Ferrie's reliance on Fuller v. Guthrie, 565 F.3d 259 (2d Cir. 1977) is unconvincing.  In Fuller, the court held that the defendant musician's allegedly slanderous comments did arise out of and was not connected to the musician's "musical services," and, as a result, did not fall within the arbitration provision that covered "every claim, dispute, controversy, or difference involving the musical services arising out of or connected with" the performance contract.  Id. at 260 (internal quotation marks omitted).  Although Fuller remains good law today, the case makes no reference to the Supreme Court's prior decision in Warrior & Gulf, in which, as discussed above, the Court stated that, "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  Warrior & Gulf, 363 U.S. at 582-83.  Given the Supreme Court's admonishment in Warrior & Gulf and the subsequent cases discussed above, the court simply cannot say that with "positive assurance" that the arbitration provision here, which covers any dispute related to Ferrie's DIRECTV "Service," was not meant to cover an invasion of privacy tort that

"positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," the additional claims that Ferrie seeks to bring in the Proposed Amended Complaint would fall within the scope of the arbitration provision. Accordingly, amendment of the Complaint would be futile, and the Motion to Amend (Doc. No. 31) is denied.  See Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008) (noting that "motions to amend should generally be denied in instances of futility"); Sherman v. Travelers Indem. Co., Civil No. 3:10cv694 (JBA), 2011 WL 1628011, at *3 (D. Conn. Apr. 28, 2011) (denying motion to amend as futile where additional claims would be subject to arbitration).

## IV.   CONCLUSION

The Motion to Dismiss and/or Motion to Stay Proceedings Pending Arbitration and to Compel Arbitration (Doc. No. 17) is **GRANTED**.  The Motion for Protective Order Staying Discovery Pending Resolution of DirecTV's Motion to Compel Arbitration (Doc. No. 18) is **TERMINATED AS MOOT**.  The Motion for Leave to File Sur-Reply Brief (Doc. No. 24) is **GRANTED**, in part, as discussed above.  The Motion to Amend/Correct the Complaint (Doc. No. 31) is **DENIED**.

**SO ORDERED**.

Dated at New Haven, Connecticut this 12th day of January 2016.


/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge

---

DIRECTV allegedly committed by recording a phone call so that it could commemorate what type of "Service" a customer said he wanted.